UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARIA MENDES, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 14-12237-DJC |
| v. | ) ) ) | |
| CAROLYN COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                            September 10, 2015

### I.     Introduction

Plaintiff Maria Mendes ("Mendes") filed claims for Social Security disability insurance benefits ("SSDI") and supplemental security income ("SSI"). R. 11.[1] Under the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Mendes brings this action for judicial review of the final decision of Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on December 28, 2012, denying her claim. D. 1; R. 18. Mendes has moved to reverse the decision, D. 28, and the Commissioner has moved to affirm it, D. 30. For the reasons explained below, the Commissioner's decision is AFFIRMED.

### II.    Factual Background

Mendes's alleged onset of disability was January 1, 2004, when she was 20 years old. R. 13, 17. She previously worked as a cashier and at a sandwich shop. R. 29-30, 225, 230.

---

[1] "R." refers to citations to the administrative record, filed at D. 16.

1

Mendes filed applications for SSDI and SSI, alleging she was unable to work due to her bipolar disorder. R. 13, 30.

## III.   Procedural Background

Mendes filed applications for SSDI and SSI on July 27, 2011. R. 11. The Social Security Administration ("SSA") initially denied Mendes's claims on October 26, 2011, R. 11, 47-60, and again upon reconsideration on January 13, 2012, R. 11, 61-76. Mendes requested a hearing before an ALJ, R. 94-99, which was held on December 17, 2012. R. 11. In a written decision dated December 28, 2012, the ALJ determined Mendes was not disabled within the definitions of the Social Security Act and denied her claims. R. 18. On March 26, 2014, the Appeals Council ("AC") denied a request to review Mendes's claim, rendering the ALJ's decision the Commissioner's final decision. R. 1-3.

## IV.   Discussion

### A.   Legal Standards

#### 1.   *Entitlement to Disability Benefits and Social Security Income*

A claimant's entitlement to SSDI and SSI turns on whether she has a "disability," defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do any of her previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505.

The Commissioner follows a five-step process to determine whether an individual has a disability. 20 C.F.R. § 416.920. All five steps are applied to every applicant; the determination

may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have or has not had within the relevant time period a severe medically determinable impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the condition for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, where the impairment does not meet the conditions of one of the "listed" impairments, if the applicant's "residual functional capacity" ("RFC") is such that she can still perform past relevant work, then the application is denied. Id. Finally, if the applicant, given her RFC, education, work experience and age, is unable to do any other work, the application is granted. Id.

### 2. Standard of Review

The Court may affirm, modify or reverse a Commissioner's decision upon review of the pleadings and the record. 42 U.S.C. § 405(g). This review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Because the Commissioner's role is "to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence, the Court must not perform such tasks in reviewing the record." Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)).

The Court must accept the factual findings of the Commissioner as conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence exists where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647

F.2d 218, 222 (1st Cir. 1981). The reviewing Court must adhere to these findings "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzell, 792 F. Supp. 2d at 148 (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted). However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). Thus, if the ALJ made a legal or factual error, "the Court may reverse or remand the decision to consider new material evidence or to apply the correct legal standard." Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotation marks omitted).

### B. Before the ALJ

#### 1. Medical History

##### a. Treatment Records

In November 2004, Mendes saw Karen Fink ("Fink"), a licensed independent clinical social worker ("LICSW"). R. 480. Mendes told Fink that she had been hospitalized two months prior, had received medication and wanted to be back on medication after she stopped taking it a few days after her discharge. Id. Mendes had been manic, "going outside naked" and "cussing people out." Id. (internal quotation marks omitted).

That same month, Mendes saw Fink a second time. R. 471-72. She reported that she had started her medication and felt it was helping her. R. 472. Mendes reflected on an abusive relationship with a partner who had introduced her to drugs. Id. She felt embarrassed by how she had acted while manic, including an arrest for shoplifting. Id. Her global assessment of

functioning score ("GAF") was 60.[2]  Id.

In November 2004, Mendes also saw Dr. Anna Fitzgerald ("Dr. Fitzgerald"), who knew Mendes from several previous admissions after her first manic episode. R. 474. During those admissions, she had been agitated, irritable and delusional with grandiose and paranoid themes. Id.  She was possibly using marijuana and cocaine. Id.  Mendes now wanted to restart her medication, which she had thrown out. Id.  She had no history of mental illness and was stable. Id.  Dr. Fitzgerald's diagnosis was bipolar disorder and she gave Mendes a GAF of 60. R. 478.

In February 2005, Dr. Fitzgerald found that Mendes did not seem to have any psychosis. R. 467.  Mendes' GAF remained at 60. R. 469. Eight months later, Mendes stated that she had stopped taking medication because it was hard to make her appointments. R. 460. Dr. Fitzgerald found her whispering while talking in a "potentially psychotic" manner and concluded Mendes was "apparently suffering a relapse." R. 460, 462. Mendes's GAF was 45. R. 462.

In December 2005, Mendes confirmed that she was having a stressful time at school and that she was suffering from social withdrawal, increased depression and paranoia. R. 456. Two weeks later, Mendes was feeling better. R. 450. Dr. Fitzgerald concluded that her bipolar disorder was "beginning to remit but still with some odd affect and possible milder thought disorder." R. 451. Mendes did "not appear entirely ready to return to school" but was "nonetheless . . . improving." Id.

---

[2] A GAF score between 45 and 50 indicates "serious symptoms or serious impairment" in functioning. Dorman v. Soc. Sec. Admin., No. 12-cv-40023-TSH, 2013 WL 4238315, at *5 n.4 (D. Mass. May 21, 2013) (quoting Campbell v. Astrue, 627 F.3d 299, 303 (7th Cir. 2010)). A GAF score between 51 and 60 reflects "moderate symptoms or moderate difficulty in social, occupational or school functioning." Navedo v. Colvin, No. 14-cv-30015-KPN, 2014 WL 6983358, at *2 n.1 (D. Mass. Dec. 9, 2014). A GAF score between 60 and 65 "reflects mild to moderate symptoms or limitations." Corbett v. Colvin, No. 11-cv-40221-RBC, 2013 WL 1332251, at *3 n.4 (D. Mass. Mar. 28, 2013).

In January 2006, Mendes planned to return to school and was cautioned by Dr. Fitzgerald and Austin Lawrence, LICSW to take only two courses. R. 440, 442. In April 2006, Mendes stated she felt better but had recent sleep issues. R. 435. Two months later, Mendes's mood was stable and was largely without perceptual abnormalities although she heard voices sometimes. R. 431. Mendes told Dr. Fitzgerald she was worried she would start using cocaine again because of her old friends, even though she had no interest in doing so. Id.

In August 2006, Dr. Fitzgerald found Mendes well. R. 426. Mendes was working at a sandwich shop and intended to restart college. Id. Mendes wanted to take two to four classes, but Dr. Fitzgerald "wonder[ed]" about her academic capacity. Id. A month later, Mendes told Dr. Fitzgerald that school was going well. R. 423. She denied mood symptoms although others had told her that she seemed sad. Id. Dr. Fitzgerald found her well-organized and non-pressured, without delusions. Id. In December 2006, Mendes reported she felt "good." R. 418. She had completed two humanities courses and felt she had passed them. Id. Her GAF was 55. R. 420.

In March 2007, Mendes reported doing "well." R. 413. In September 2007, Dr. Fitzgerald mentioned Mendes's bright attire and mood. R. 403. Mendes showed no manic or depressed symptoms but was self-confident and "clearly pleased with her recent stability." Id. Dr. Fitzgerald concluded that her bipolar disorder was in full remission. R. 406.

In December 2007, Mendes told Dr. Fitzgerald she felt great and was enjoying her courses. R. 398. Although she occasionally heard "a voice" when tired, Mendes denied feeling depression, mania or any sleep, appetite or energy changes. Id. Her bipolar disorder remained in full remission and her GAF was 55. R. 400.

In February 2008, Dr. Fitzgerald reported that Mendes was "functioning well." R. 394. Mendes sometimes heard voices but was able to "shrug them off." Id. In April 2008, Mendes was "[e]uthymic and without manic and psychotic symptoms." R. 390. Two months later, Dr. Fitzgerald reported Mendes's mood was stable but that her affect was odd at times. R. 386.

In August 2008, Mendes was grieving her father's death. R. 382. She was feeling anxious and hearing more voices, but was functioning fine with no safety concerns. Id. Three months later, Mendes was "functioning well socially and at school." R. 377. Although she was mourning the loss of another relative, Dr. Fitzgerald found her "[c]heerful and without psychosis." Id. Her bipolar disorder remained in remission and her GAF was 55. R. 379.

In February 2009, Dr. Fitzgerald reported that Mendes was "[e]uthymic and friendly." R. 373. Mendes was proud to be taking psychology classes at school. Id. Mendes had no mood or psychotic symptoms. Id. Two months later, Mendes was still doing well and taking electives in school. R. 369. In July 2009, Mendes mentioned that family arguments at home made her stressed. R. 364. She attended church daily, which was helping, but her priest was leaving for Cape Verde, which saddened her. Id. In October 2009, Mendes attended her appointment with a supportive new boyfriend. R. 359. Mendes was happy about the relationship and felt she was doing well, although she sometimes heard voices when tired. Id. Her bipolar disorder remained in full remission and her GAF was 65. R. 361.

In April 2010, Dr. Fitzgerald reported that Mendes came to the appointment with her boyfriend. R. 355. Both felt she was doing well, but Dr. Fitzgerald noted that Mendes seemed a bit less ebullient and more anxious than usual. Id. A month later, Dr. Fitzgerald reported that Mendes was off from school for the summer and looking for work. R. 348. Mendes had three more courses and "still hopes to become a corrections officer." Id. Mendes stated that she felt

7

good and was "functioning well," although she acknowledged she had low self-esteem sometimes and heard voices when very anxious or tired. Id. In November 2010, Dr. Fitzgerald wrote that Mendes was "[g]enerally cheerful" but mentioned a concern raised by her academic dean that her medication may be slowing down her cognition. R. 343. Mendes was also newly engaged and she showed Dr. Fitzgerald her engagement ring. Id. Her bipolar disorder remained in remission and her GAF was 65. R. 345.

In January 2011, Mendes was having trouble sleeping and more anxious and irritable. R. 503. In March 2011, Dr. Fitzgerald wrote that Mendes had left conflicting messages for her. R. 339. One message mentioned that she was very depressed and wanted something like Prozac. Id. The next message stated she was fine and it was just a misunderstanding with her fiancé. Id. At her appointment, Dr. Fitzgerald also found her "labile," "with some tearfulness, some laughter, and some evident anxiety." Id. Mendes reported sleeping fine but was anxious about school. Id. The next month, Mendes stated that she had to drop out of school because she was depressed and she could not afford it. R. 336. She found going to church helpful but spoke with the pastor too much. Id. She also wanted to move out of her home and live with her fiancé. Id.

In August 2011, Dr. Fitzgerald wrote that "[t]hings are going well." R. 331. Mendes was looking forward to her wedding and she was going back to school with only three courses to go. Id. She had changed churches and the new one was suiting her better. Id. Dr. Fitzgerald noted she was well groomed, alert and engaged. R. 332. Her thought process was coherent, logical and appropriate for the situation. Id. Mendes had no perceptual or judgment impairment, her memory was "intact" and she denied thoughts of suicide or thoughts to harm others. R. 333. Her bipolar disorder remained in full remission and her GAF was 55. Id.

In November 2011, Mendes had married, the couple was "happy" and she was doing well. R. 490. Mendes expressed an interest in working and had worked at a supermarket before, but she was worried she would get too tired. Id. Dr. Fitzgerald wrote that she felt Mendes seemed too nervous and hyper for full-time work. Id. Her bipolar disorder remained in full remission and her GAF was 55. R. 492.

In April 2012, Dr. Fitzgerald wrote that Mendes "[c]ontinues to worry and feel guilty sometimes in . . . [an] OCD and guilty delusional manner." R. 569. Church sometimes made her feel worse and she occasionally heard voices while attending. Id. Mendes told Dr. Fitzgerald she was applying for disability, and Dr. Fitzgerald thought Mendes should qualify. Id. Her bipolar disorder remained in full remission and her GAF was 55. R. 571.

In July 2012, Mendes and her husband reported that she was doing well. R. 564. Dr. Fitzgerald observed that despite some anxiety with her family, Mendes was "relatively euthymic," with no mania or psychosis. Id. Mendes stated she did not think she could work full time but could work up to 20 hours. Id. She also stated she needed to stay away from going to church "too much" because it had triggered her psychotic episodes in the past. Id. Her bipolar disorder remained in full remission and her GAF was 60. R. 566-67.

In August 2012, Mendes told Dr. Fitzgerald that her mother-in-law had invited her to live with them but that she was unsure whether to accept. R. 560. With only two courses left, she expressed a desire to return to school. Id. The same month, Mendes also saw Mary Ann Whalen, LICSW. R. 554. Mendes stated that medication was keeping her stable but she was getting fearful at night and sleeping poorly. Id. She denied hallucinations, id., but was stressed by living in crowded conditions with her mother and her siblings, R. 558. Her husband lived with his mother somewhere else. Id. Her main source of support was church, where she went at

least four times a week. Id. Other than attending church, Mendes read, listened to music and played with her sisters. R. 556. Mendes was alert, cooperative and logical, but her mood was anxious, sad and irritable. R. 558. Her bipolar disorder remained in full remission and she had a GAF of 60. Id.

In October 2012, Mendes reported she was tired of living with her family but also having issues with her husband. R. 572. Church remained helpful yet stressful. Id. Mendes was awaiting the outcome of her disability application but "[p]artly wants to work." Id. Although she expressed anxiety about her sleep schedule, Mendes was actually able to sleep "well most of the time." Id. Dr. Fitzgerald wrote "[c]hronic mental illness [was] essentially stable" and Mendes "[d]oes appear disabled." R. 574. Her bipolar disorder remained in full remission and she had a GAF of 60. R. 575.

b.  SSA Records

In August 2011, Mendes submitted an adult function report to the SSA. R. 238, 245. She reported taking a while to dress and bathe. R. 239. She did not eat as much due to her medication. Id. She did not like to go out and preferred to stay in her room. Id. She did not, however, need special reminders to take medicine or take care of personal needs and grooming. R. 240. She was able to make her own meals, breakfast daily and lunch and dinner three to four times a week. Id. The only chore she liked to do was laundry. Id. She needed to be motivated by someone else. Id. She liked lying down and watching TV. R. 241, 242. She attended church regularly but expressed a desire to go more often. R. 242. She could go out alone and traveled by bus but did not drive. R. 241. She shopped in stores but shopped quickly. Id. She reported being able to pay bills, count change, handle a savings account and use a checkbook. R. 241, 242. She noted that her illness affected her standing, talking, memory, tasks, concentration and

understanding and getting along with others. R. 243. She handled stress well but disliked changing routines. R. 244.

On October 24, 2011, Dr. James Carpenter reviewed Mendes's records on initial review. R. 50, 56. He concluded that she did not have severe mental impairment because she was planning on getting married and going back to school and Dr. Fitzgerald reported that her bipolar disorder was in complete remission. R. 50, 56.

On January 12, 2012, Dr. Carol Montgomery reviewed Mendes's records for reconsideration. R. 65. She concluded that Mendes did not have severe mental impairment because there was no worsening of mental health symptoms and her disorder remained in full remission. Id. Mendes was "[r]ecently married and happy." Id. Although there was a report of increased fatigue, it may have been related to medication side effects, and there was "no indication" that the fatigue affected functional living skills. Id.

    *2. ALJ Hearing*

At the December 17, 2012 administrative hearing, the ALJ heard testimony from Mendes and vocational expert ("VE") Faith Johnson. R. 23-46. Mendes testified she was currently on welfare. R. 29. She last worked at a sandwich shop. R. 29-30. She graduated high school and had been working toward a college degree for ten years. R. 27-28. At the time of the hearing, she had stopped attending school and she testified that her grades had been poor. R. 41-42.

As to her bipolar disorder, she reported experiencing both depressed and manic states. R. 31. When depressed, she has crying spells every day that last a few minutes. Id. She reported isolating herself, feeling unmotivated and staying in her room to avoid talking to people in person or on the phone. R. 32. She experienced fatigue and had to lie down for two to four

hours, typically every day. R. 33. When manic, she became hyper and talkative. R. 34. She switched between the two states every day. R. 34.

Mendes testified that she has trouble concentrating and has a poor memory. R. 34-35. Although capable of reading, she noted that she dislikes reading books because she gets confused and loses focus. R. 35. Mendes also reported hearing voices, either her mother's or her friends' voices. R. 36. The more active she was, the more voices she heard. R. 36. She testified that she would like to go to church every day as she had before, but she now limits it to once or twice a week. R. 38-39. When she went to church more often, she was hearing more voices. R. 38-39. She also had trouble sleeping regularly. R. 36-37.

Mendes noted that she does not cook because she has trouble focusing, often leading to burnt food. R. 39. She also reported that she does not clean or vacuum because she feels like she does not know how. R. 40. She does her own laundry, "little by little." R. 40. When manic, she tends to want to go shopping for groceries, but she shops quickly. R. 41.

The VE testified that for a hypothetical individual between age 20 and 29 with a high school education, no past relevant work experience, no exertional impairments, but who is frequently unable to understand, remember or carry out complex or detailed instructions, that person "would only be able to do unskilled work." R. 45. Assuming that Mendes's testimony was completely credible, the VE did not know of any jobs that Mendes could perform on a full-time basis. Id.

### 3. Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found Mendes was not engaged in substantial gainful activity and had not been since January 1, 2004, the date of the alleged onset of her disability. R. 13. At step two, the ALJ found, for the purposes of his

decision, that her bipolar disorder was "severe." Id.  At step three, the ALJ determined Mendes did not have an impairment or combination of impairments that met one of the listed impairments in the Social Security regulations.  R. 14-15.  At step four, the ALJ found Mendes had the RFC to "perform a full range of work at all exertional levels but with the following nonexertional limitations:  [s]he would frequently be unable to understand remember or carry out complex or detailed instructions but could carry out simple repetitive routine tasks."  R. 15.  At step five, the ALJ found there were jobs in "significant numbers" in the national economy that Mendes could perform.  R. 17-18.  Accordingly, the ALJ concluded Mendes was not disabled as defined by the Social Security Act.  R. 18.

### C. Mendes's Challenges to the ALJ's Findings

Mendes seeks reversal of the ALJ's decision, or alternatively, remand for further proceedings.  D. 28 at 1.

#### 1. Weight as to Dr. Fitzgerald's Opinion

Mendes's first two arguments concern Dr. Fitzgerald.  Mendes alleges that the ALJ committed legal error (1) by affording little, rather than controlling, weight to Dr. Fitzgerald's opinion that her "illness prevents her from working full time and is disabling," D. 29 at 8 (citing R. 566), and (2) by failing to provide good reasons for doing so.  Id. at 9-10.

Generally, an ALJ gives controlling weight to a treating physician's opinion only if that opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) consistent with "other substantial evidence in [the claimant's] record."  20 C.F.R. § 404.1527(c)(2).  An ALJ is not obligated to accept a treating physician's conclusions. Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998).  The ALJ may "downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where . . .

it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Shields v. Astrue, No. 10-cv-10234-JGD, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011) (quoting Arruda v. Barnhart, 314 F. Supp. 2d. 52, 72 (D. Mass. 2004)) (internal quotation marks omitted).

When a treating physician's opinion is not controlling, an ALJ considers six factors to determine the proper weight for that opinion: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence in support of the medical opinion; (4) the consistency of the medical opinions reflected in the record as a whole; (5) whether the medical provider is a specialist in the area in which he renders his opinion; and (6) other factors which tend to support or contradict the opinion." Guyton, 20 F. Supp. 2d at 167. The ALJ also applies these factors when determining the weight to give any other medical opinion. Moore v. Astrue, No. 11-cv-11936-DJC, 2013 WL 812486, at *7 (D. Mass. Mar. 2, 2013) (citing 20 C.F.R. § 404.1527(c)(1)-(6)).

There is, however, "no requirement that an administrative law judge slavishly discuss" each factor in his decision. Moore v. Astrue, No. 06-cv-00136-JAW, 2007 WL 2021919, at *6 (D. Me. July 11, 2007), report and recommendation adopted, 2007 WL 2344957 (D. Me. Aug. 8, 2007). A failure to address every factor does not require a remand as long as the ALJ's "decision and reasoning are sufficiently clear." Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008). It would be "a waste of judicial resources to remand [a] case so that another hearing officer may arrive at the same decision with more clarity." Id.; see Dietz v. Astrue, No. 08-cv-30123-KPN, 2009 WL 1532348, at *7 (D. Mass. May 29, 2009) (noting "the First Circuit has upheld the rejection of treating-physician opinions on the basis of select factors") (citing Morales v. Comm'r of Soc. Sec., 2 F. App'x 34, 36 (1st Cir. 2001)). "Good reasons can be

14

provided by discussing just one factor." Pelletier v. Astrue, No. 09-cv-10098-GAO, 2012 WL 892892, at *4 (D. Mass. Mar. 15, 2012).

Ultimately, whether the claimant is disabled is reserved for the Commissioner to determine. 20 C.F.R. §§ 404.1527(d), 416.927(d). As a result, the "opinion of a treating physician that a claimant is unable to work is entitled to no deference at all (as it is not a medical opinion)." Foley v. Astrue, No. 09-cv-10864-RGS, 2010 WL 2507773, at *8 (D. Mass. June 17, 2010) (citing Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 n.7 (1st Cir. 2007)).

Here, the ALJ did not err in not giving controlling weight to Dr. Fitzgerald's opinions and did not fail to provide good reasons for doing so. First, Dr. Fitzgerald's comment that Mendes's "illness prevents her from working full time and is disabling" is not entitled to deference because it is not a medical opinion. R. 566; Foley, 2010 WL 2507773, at *8. Second, even though Dr. Fitzgerald's opinion that Mendes is disabled is not entitled to deference, the ALJ nevertheless considered the opinion. R. 17. The ALJ accorded it little weight after discussing the medical opinions reflected in the record as a whole and finding that Dr. Fitzgerald's opinion was inconsistent with the record, against both Dr. Fitzgerald's own treatment notes and the opinions of the non-treating physicians. Id.

After Mendes's first manic episode in 2004, Dr. Fitzgerald found that by late 2005, Mendes was improving and her bipolar disorder had begun to go into remission. R. 451. By mid-2006, Mendes was working at a sandwich shop and planning to restart college. R. 426. At the end of 2006, Mendes had completed two college courses and felt good about them. R. 418. A year later, in 2007, Mendes was pleased with her progress and Dr. Fitzgerald concluded that her disorder was in full remission. R. 403, 406.

For the next three years, Mendes continued to do well, even as she coped with the death of her father and another relative. R. 377, 382. She continued her college classes, R. 369, found a new supportive boyfriend who later became her fiancé, R. 343, and thought about looking for work, R. 348. By 2011, Mendes had married, R. 490, she had changed churches and was three classes away from getting her college degree. R. 331. In 2012, Mendes continued to be stable and twice expressed an interest in working at least part-time. R. 564, 572. Since 2007 and throughout this entire time, Mendes's bipolar disorder remained in remission and she received GAF scores ranging from 55 to 65, reflecting mild to moderate symptoms. See, e.g., R. 379, 361, 567. Both non-examining psychologists who reviewed Mendes's records up to January 2012 concluded that Mendes's mental impairment was not severe. R. 50, 56, 65.

Mendes faults the ALJ for relying on her GAF scores, arguing that doctors no longer use GAF scores as a diagnostic tool for a patient's functioning. D. 29 at 12. Mendes is correct that the American Psychiatric Association has stopped using the GAF score. D. 31 at 15 (citing Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013)). But the GAF scale was in effect when Dr. Fitzgerald used them for Mendes and the SSA has also adjusted their practices. Id. Although ALJs "cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation," they can continue to "consider GAF scores just as [they] would other opinion evidence, [although] scores must have supporting evidence to be given significant weight." Bourinot v. Colvin, No. 14-cv-40016-TSH, 2015 WL 1456183, at *13-14 (D. Mass. Mar. 30, 2015) (citations and internal quotation marks omitted).

Here, the ALJ did not rely on GAF scores in isolation nor did he compare GAF scores from different doctors. Instead, the ALJ declined to give controlling weight to Dr. Fitzgerald's

16

opinion that Mendes could not work because the ALJ noted the "inconsisten[cies]" between that opinion and Dr. Fitzgerald's own treatment notes, including but not limited to the GAF scores. R. 17. Specifically, the ALJ concluded that Dr. Fitzgerald's opinion was "inconsistent with the record, which show[ed] stable symptoms with medication and normal activities of daily living." Id. The ALJ also found that Dr. Fitzgerald's opinion was "inconsistent with the doctor's own treatment notes, which consistently report[ed] stable symptoms." Id. Ultimately, using GAF scores in part to point out these inconsistencies does not constitute legal error. Bourinot, 2015 WL 1456183, at *13-14; see Navedo v. Colvin, No. 14-cv-30015-KPN, 2014 WL 6983358, at *4 (D. Mass. Dec. 9, 2014) (concluding that the ALJ was free to downplay the claimant's mental health provider's opinion because the opinion was inconsistent with the GAF score and record evidence). Here, substantial evidence supported the ALJ's decision to give little weight to Dr. Fitzgerald's opinion.

> 2. *Substantial Evidence That Mendes's Impairment Did Not Meet the Listed Impairments Criteria*

Mendes bears the burden to prove that her mental impairment meets the condition for one of the "listed" impairments in the Social Security regulations. Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989). Here, the ALJ found that Mendes's mental impairment did not meet or medically equal the criteria in Paragraph 12.04 in Appendix 1 to 20 C.F.R. Part 404, Subpart P because she could not demonstrate that her bipolar disorder resulted in at least two of the following: (1) "Marked restriction of activities of daily living"; (2) "Marked difficulties in maintaining social functioning"; (3) "Marked difficulties in maintaining concentration, persistence, or pace"; or (4) "Repeated episodes of decompensation, each of extended duration." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Mendes argues that the ALJ's conclusion was not supported by substantial evidence because the ALJ "selected isolated pieces of evidence" to support his determination. D. 32 at 9. For example, Mendes points out that the ALJ ignored her testimony at the hearing that she sometimes lacks motivation to cook and has crying spells every day. D. 29 at 11-12; D. 32 at 8.

The evidence as a whole supports the ALJ's decision. This is particularly so because "[c]onflicts in the evidence are for the ALJ to resolve, not for doctors or the courts." Simons v. Colvin, No. 13-cv-11668-MBB, 2015 WL 4275252, at *14 (D. Mass. July 15, 2015); see Quaglia v. Colvin, 52 F. Supp. 3d 323, 334 (D. Mass. 2014) (stating that "[r]esolving evidentiary conflicts in the record is strictly the domain of the hearing officer").

More importantly, the standard is not whether the record could justify a different conclusion. The law is clear that "even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Hill v. Astrue, No. 12-cv-30018-KPN, 2012 WL 5830707, at *6 (D. Mass. Nov. 15, 2012) (quoting Irlanda, 955 F.2d at 769); see Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) (noting that courts "must affirm the Secretary's [determination], even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence") (citation and internal quotation marks omitted).

The ALJ cited several different examples in Mendes's life to support his finding that Mendes showed only "mild restriction" for activities of daily living and "mild difficulties" in social functioning. R. 14. Mendes was able to go outside, take the bus, attend church and shop. Id. During this period, Mendes got engaged and married, took college classes and attended church frequently. Id. The record also reflects that Mendes's bipolar disorder has been in

remission since 2007, R. 406, and that at a 2012 appointment, the most recent year available in the record, Mendes was "cooperative," "engaged" and "coherent," without any perceptual or judgment impairment and with an "intact" memory. R. 566.

Although Mendes did testify that she had issues focusing while cooking and that she had daily crying spells, the ALJ found that Mendes's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely credible." R. 16. Credibility determinations by an ALJ, "who observed the claimant, evaluated h[er] demeanor, and considered how that testimony fit in with the rest of the evidence, [are] entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). The Court concludes that for all of these reasons, there was substantial evidence in the record to support the ALJ's findings.

## V.  Conclusion

For the above reasons, the Commissioner's motion to affirm, D. 30, is ALLOWED and Mendes's motion to reverse or remand, D. 28, is DENIED. The Court ALLOWS *nunc pro tunc* Mendes's motion for an extension of time, D. 19.

**So ordered.**

/s/ Denise J. Casper
United States District Judge